JOHN H. GOUGEON, PLAINTIFF-APPELLANT, v. BOARD OF ADJUSTMENT OF THE BOROUGH OF STONE HARBOR, BOROUGH COUNCIL OF THE BOROUGH OF STONE HARBOR, DEFENDANTS-RESPONDENTS, AND JOSEPH F. GREENE AND MARGARET E. GREENE, HIS WIFE, AND DILLWYN T. WATTIS AND BERNICE WATTIS, HIS WIFE, INTERVENORS-RESPONDENTS.

Argued March 18, 1969—Decided June 2, 1969.

Mr. *Joseph P. Greco* argued the cause for plaintiff-appellant (*Messrs. Estabrook and Glickman* on the brief).

Mr. *Joseph F. Greene, Jr.* argued the cause for intervenors-respondents (*Messrs. Curry, Purnell & Greene,* attorneys).

Mr. *John W. Gilbert* argued the cause for defendants-respondents.

The opinion of the court was delivered by

FRANCIS, J. This zoning case is before the Court for the second time. Plaintiff John H. Gougeon, owner of an undeveloped lot on the bay or basin front in the Borough of Stone Harbor, sought a variance or exception from the lot-area requirement of the zoning ordinance in order to build a year-round home thereon. After a hearing the Board of Adjustment denied the application. Subsequently the Superior Court, Law Division, reversed the Board's action and the

Appellate Division affirmed the reversal. After granting certification, 51 *N. J.* 184 (1968), we concluded the record was inadequate for a proper disposition of the matter and remanded to the Board for further hearing and redetermination. 52 *N. J.* 212 (1968). More particularly, we directed that on the rehearing, consideration be given to conditions, particularly lot sizes, both developed and undeveloped, over the widest relevant area bearing upon plaintiff's right to a variance or exception. In addition, referring to *N. J. S. A.* 40:55–39, we instructed the Board to deal precisely with the question whether a variance or exception could be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zone plan and ordinance. And we indicated that if those conditions were met "the right to a special exception or a variance would appear to exist." 52 *N. J.*, at 220. We said also that whatever conclusion was reached with respect to these negative criteria, the specific factual findings and reasons on which they were based should be stated. Finally, we said that if the evidence at the new hearing satisfied the negative criteria, the Board could consider, in deciding whether denial of relief would visit exceptional or undue hardship, whether plaintiff had received any offers from third persons to buy his lot at its fair market value. 52 *N. J.*, at 224.

The rehearing was held and additional evidence was received by the Board. Unfortunately a substantial part of the time was spent in colloquy and objections between counsel for the Board of Adjustment and for the intervenors Greene on the one hand and counsel for Gougeon on the other. Much of the difficulty centered around efforts by the intervenors and Board counsel to limit the geographical area to be considered by the Board. The intervenors had come to the hearing planning to limit the territory to be discussed to a certain area, *i. e.*, the southern portion of a peninsula on which the lot in question is located. The area is described as blocks 99, 100 and 200 on the tax map and in total length, from 99th Street to the bay, is about 1,060 feet, a distance ex-

cluding the width of the two east-west streets, approximately equal to the frontage of thirty-two 30-foot lots. The intervenors, with the concurrence of the Board attorney, prevailed upon the Board to accept their so-called environmental limitation over Gougeon's objection that a significantly larger area ought to be considered. In fact Gougeon wanted the Board to consider the densely populated residential area just 175 feet across the bay basin from his property, where most of the homes were built on lots the same size as his. This section is in full view of his property and the other lots on Berkley Road, where plaintiff's lot is situated, and is separated only by a distance of less than six 30-foot lots. These lots are in block 103, and as one map of the intervenors shows, the great majority of them have 30-foot frontage. The photographs in evidence showing the lots of the intervenors Greene and of the plaintiff, as well as the development across the strip of water, give the appearance that the two sections are very close to each other. In our view Gougeon's suggestion would have provided a broader base for evaluating his claim for relief and should have been accepted. Acceptance would have been thoroughly consistent with the statement in our earlier opinion that the Board should give "consideration * * * to conditions existing over the widest possible residential area which may reasonably bear upon the plaintiff's right to a variance or exception." 52 *N. J.*, at 222. Considerable justification for the quoted suggestion is found in the statement of the intervenors' real estate expert who described the development of Stone Harbor as dense and congested.

At the conclusion of the rehearing the Board recessed for 20 minutes and returned with a decision denying the variance or exception. It said also that even if the proof did satisfy the negative criteria of the statute, the relief sought would be denied if within 15 days the intervenors offered to pay the fair market value of the lot which it found to be $8,100. Such an offer in the Board's view would remove any claim of undue or exceptional hardship. The

offer was made and rejected. Pursuant to our reservation of jurisdiction Gougeon now seeks a review of that decision here.

In order to present the case in its present form it is necessary to repeat some of the facts outlined in our earlier opinion. Gougeon is the owner of an undeveloped 30′ x 110′ lot known as 415 Berkley Road, Stone Harbor. It is bounded by Berkley Road on the north and by the Stone Harbor Basin on the south. The record indicates that in 1921, when a private company was developing the Borough, lots of 30-foot frontage and 110-foot depth were the type commonly sold in the area. Plaintiff's lot was acquired in 1936 by his father. In 1946 the father conveyed it to plaintiff and his two brothers. By deed dated April 2, 1958 the two brothers transferred their interest to plaintiff. 52 *N. J.*, at 216.

In December 1957 the Borough enacted a zoning ordinance which placed plaintiff's lot in the Residential A district. In such district no building can "be erected on a lot of less than 5,000 square feet." There is no minimum frontage requirement. Thus a lot 30′ x 167′ would be a conforming lot. The ordinance provided also that not more than 25% of the lot area could be occupied by a building; further, a 10-foot front yard, a minimum 25-foot rear yard and side yards each of a minimum width of 10 feet were required. No building construction, except for a garage or accessory structure, was permitted which would be less in area than 900 square feet, measured at ground level.

The odd character of this ordinance is obvious. A 30′ x 170′ plot would contain 5,100 square feet and so would be a conforming building lot. Yet if 10-foot side yards are required, the building could not exceed 10 feet in width. In order to meet the area requirement of 900 square feet, the building would have to be 10′ x 90′ — an impossible prospect. On its face the practical effect of the ordinance is to render 30-foot lots useless for residential building. 52 *N. J.*, at 216, 217.

As we noted in the earlier opinion, obviously when the governing body adopted the zoning ordinance it knew 30-foot

lots were characteristic of the Borough, many of which had homes already built upon them and many of which were undeveloped. This knowledge led the Council to create an avenue of relief for owners of undeveloped 30-foot lots. Section 9(c) was added which provides:

"Where a lot containing less square footage than required for the district in which it is located, was purchased prior to the effective date of this ordinance, to which this ordinance is an amendment, the then and now owner thereof may erect upon such lot a building with side yards of lesser width than required for the aforementioned district but in no case less than 5 feet for each side yard and 6 feet from the front property line, subject to the approval of the Board of Adjustment as hereinafter created."

Two owners of undersized lots have been granted permission to build homes under this section. Whether any such owners have been denied relief except this plaintiff does not appear.

Early in 1965 plaintiff decided to build a home on his 30' x 110' plot. According to the plans submitted to the Borough, it is to be a year-round insulated house, as contrasted with most of the dwellings in the area which are summer residences. Gougeon and his wife intend to live there permanently upon his retirement. His building is to be a two-story frame structure with a concrete and masonry foundation. It will contain three bedrooms, two bathrooms and a powder room, a living room, den, kitchen and utility room. Dimensions of the building are 20' x 38', an area of 760 square feet or 23% of the 3,300 square-foot lot. The Building Inspector denied a permit to build because the lot was undersized and the 10-foot side yard requirements of the ordinance could not be met. 52 *N. J.*, at 217–218.

There is no doubt that under Section 9(c) of the ordinance quoted above the Board of Adjustment may grant plaintiff's request for an exception from the area and side and front yard restrictions so that his home may be built. Plainly the Board is also empowered by *N. J. S. A.* 40:55–39 (c) to grant such a variance. However, as we noted earlier, the relief sought cannot be given under either ordinance or

statute "unless [it] can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." *N. J. S. A.* 40:55–39. Determination of that question makes necessary some further reference to the physical layout and development of the area involved.

Stone Harbor is a seasonal family resort with a year-round population somewhat in excess of 850 persons. It has over 15,000 summer visitors. The development is dense, over 2,300 homes in addition to a well-established business district, schools, churches, motels, guest houses and restaurants. Growth of the community has reduced the total number of vacant lots in the Borough to approximately 200, three of which are located on Berkley Road in the same block as plaintiff's property. While noting the density of the community, plaintiff's expert witness explained that the term high density population as used by him related to the number of smaller homes on smaller lots. For example in one section referred to as about one-half mile away from Gougeon's lot there are about 100 homes built on lots 1,000 square feet or less in area. He spoke of them as "the most desirable and highest price lots" in the Borough. He did not think the homes had a detrimental effect on the community because the Borough was laid out primarily with streets of 60-foot width. These wide streets effectively served as buffer zones not only in that location but throughout the municipality since the lots generally were only 110 feet in depth; they gave the appearance of spaciousness and actually aided in providing plenty of light and air.

In discussing the neighborhood involved here, the witness said it consisted largely of one-family dwellings, several duplex residences and a three-story frame apartment house. Many of the dwellings were located on lots 30' x 110', with some of the newer homes on slightly larger lots. The specific area described above, *i. e.,* blocks 99, 100 and 200, running south from 99th Street past Berkley Road to the bay basin, was the principal subject of the testimony. A review of the

record indicates the parties failed to get together before the hearing (as we hoped they would, 52 *N. J.*, at 222), and to agree in advance upon all of the important physical facts. The result was an unnecessary expenditure of time in the examination of witnesses and discussion among counsel as to sizes of lots and location of dwellings thereon. Very little attention was given to proof of the width of side yards of existing dwellings built either on single 30' x 110' lots or on two or more such lots which had come into single ownership. It is unwise for parties who live in the community involved to assume a court can become fully educated about all pertinent physical facts and their significance in a zoning case simply by examination of maps that are not fully informative or by analyzing discussions among the informed. See, *Reinauer Realty Corp. v. Borough of Paramus*, 34 *N. J.* 406, 417 (1961).

In any event, the parties seem to agree there are 68 lots in single ownership in blocks 99, 100 and 200. This number includes single 30' x 110' lots and combinations of such lots in single ownership. Twenty-one of the 68 lots have frontages of less than 50 feet. As the intervenors' map shows, 12 of them have 30-foot frontages; of the remainder, two seem to be 47.13 feet, the others 45, 44.52, and 35.1 feet respectively. With two exceptions, these 21 lots have less than 5,000 square feet in area. Ten of the twelve 30-foot lots are improved; two including Gougeon's are vacant. A significant consideration is the width of the side lines on the already improved 30-foot lots, *i. e.*, the distance from the sidewall or porch or bay window of the house to the lot line. The map reveals the following side yards on 30-foot lots in close proximity to Gougeon:

Lot 450, Owned by the intervenors
Greene and next to Gougeon ..... 4.06 and 3.82 feet
" 460 ..... 5.53 and 1.95 "
" 461 ..... 4.57 and 5.16 "
" 468 ..... 1.12 and 4.8 "
" 469 ..... 1.12 and 8.7 "
" 470 ..... 2.94 and 6.78 "

| | | |
|---|---|---|
| " 146 | 4.8 and 4.84 | " |
| " 157 | 5.1 and 4.29 | " |
| " 170 | 4.7 — southerly side line not given. Garage 9.62 feet | |
| " 418 | 7.17 and 2.45 feet. | |

It may be noted also that in a number of instances of two or more lots in single ownership, the dwelling thereon is located wholly within the lot lines of one of the 30-foot lots, leaving the other 30-foot lots vacant.

Gougeon's lot, which has been in his family for 33 years is irreplaceable. There is no other lot available on the bay. He made an offer to the present owner of lot 448, the 30-foot next-door plot to the west, to buy it for $9,000 or if the whole lot was not available, he would be willing to buy enough of it to improve appreciably the square-foot area of his lot. (Lots 448 and 449 are in single ownership. The house thereon had apparently been burned to a substantial extent in April 1968). The offer was refused. He submitted an offer of $15,000 for intervenors Greenes' lot 450, next door to the east, and indicated he would go to $20,000. The Greene 30-foot lot has a frame summer dwelling on it which Gougeon said he would tear down. The offer was likewise rejected. The Greenes offered $7,000 for Gougeon's plot but he declined. He also declined an offer of $9,000 from the owner to the west. There is little doubt that Gougeon's lot is a desirable one. It is level and well drained. It has a bulkhead, a dock and a boat slip at the water which cost $1,500. In front of the lot on the Berkley Road side there is a sidewalk and a curb, and all utilities are available. As we have said, Gougeon wishes to build thereon the year-round house described above and to live in it upon retirement.

Plaintiff's real estate expert testified that building such a house upon the 30-foot lot would not be detrimental to the character of the neighborhood or the health of the area nor would it substantially impair the intent and purpose of the zoning plan of the Borough. It would not create a fire hazard. In fact, he said "if anything, it would enhance the

value" of the land in the area because of the attractiveness of the building itself. His opinion was based upon a survey of the entire community and the high density of its development. In the particular neighborhood involved the improvements are largely on relatively small lots, 30, 45 and 60-foot frontages. He gave consideration to the existing side yards, many of which are approximately 5 feet in width; and he noted that frequently dwellings are separated by 10 feet or less. Overall he could see no depreciation of property values and no detriment to the community zone plan or the neighborhood resulting from plaintiff's proposed home.

The intervenors produced an expert who expressed a contrary view. He said "squeezing" in the Gougeon home would depreciate the value of the Greene 30-foot lot on the one side and the larger lot on the other side; it would not be advantageous to the other properties in the vicinity and would be a fire hazard. His idea was that adding one more house on a small lot would impair the zoning plan and constitute a detriment to the public good. The Board of Adjustment agreed with that view. We disagree.

It seems to us that undue emphasis has been placed upon the possible disadvantage to the Greene lot if Gougeon is given the exception or variance. Each lot is 30′ x 110′. It seems obvious the Greenes put the frame summer dwelling on their lot prior to the passage of the zoning ordinance and apparently at a time when there were no side yard restrictions. So without regard to their neighbor's 30′ x 110′ property they built one side of the house 4.06 feet from the Gougeon lot line and 3.82 feet from the neighbor's lot line on the other side. If thereafter and before the zoning ordinance Gougeon had duplicated the Greenes' performance and built as closely to his lot lines as they had already done, obviously they could have had no legal ground for complaint.

The actual physical consequences of construction of the home on Gougeon's lot do not present the "squeezing" picture envisioned by the Greenes' witness. The house will be 5 feet

from the lot line on each side. On the west side, the home will be at least 15 feet from the wall of the (burned) house on lot 448. And since the lot, being a combination of two 30' x 110' lots, contains a 60-foot frontage, it may be that if that house is rebuilt (the record is silent as to its present condition), the owner may place it even farther to the west of Gougeon's line. On the east of Greenes' side of the Gougeon home, there will be 9.06 feet between the two dwellings. And on the east side of the Greene house where lots 451 and 452 are in a single ownership, there is a space of 28.7 feet to the next house.

In addition to the condition just described, another physical factor requires mention. The Gougeon house, when built, will be one of only four dwellings within the entire block at the southern end of the peninsula. The block is bounded on the north by Berkley Road, a 60-foot street, on the east by Corinthian Drive, a 60-foot street, on the west by Sunset Drive, a 60-foot street, and on the south by the bay basin. The total vista is one of ample space and light and air, and Gougeon should not be denied relief because one side of his proposed home will be 9.06 feet from the Greene house. In this connection the intervenors' map shows there are at least 31 homes in tax map blocks 99, 100 and 200 with one or both sidewalls less than 10 feet from the lot lines.

Everyone agrees that if Gougeon is denied an exception or variance his property cannot be built upon and becomes zoned into idleness. In view of the unusual circumstances in the case, we have concluded that such a result would constitute undue or exceptional hardship. And we feel that the hardship is of such nature that the relief ought to be granted in spite of the offer made by the Greenes to purchase the lot. (Consequently we do not reach the issue of the adequacy of the value of the Gougeon lot as fixed by the Board of Adjustment.) Although we indicated in our earlier opinion that the Board could consider fair market value offers for the lot in deciding whether Gougeon would suffer undue and exceptional hardship by enforcement

of the letter of the zoning ordinance against him, it was not intended that existence of such an offer, of itself, would warrant denial of relief. 52 *N. J.*, at 224. It was intended that such an offer would constitute a circumstance to be considered in the application of the Board's statutory discretion to the whole case. On the totality of the facts in *this* case, and particularly since the proof satisfies the negative criteria of the statute for the granting of a special exception or variance, we are satisfied that the Board's denial of relief to Gougeon constituted an unreasonable exercise of its discretion.

One final matter should be mentioned. According to the building plans submitted by Gougeon the ground area to be covered by the structure is 760 square feet, whereas the ordinance calls for 900 square feet. The Board did not reject the exception or variance on that ground at either the first or the second hearing. Presumably the reason was that the slightly smaller building would cover 23% of the lot area, whereas 900 square feet of coverage would amount to 27% or 2% over the authorized limit. In our first opinion we pointed this out and said "We assume from the absence of any suggestion to the contrary that the Board did not consider the 760 square foot area of plaintiff's proposed structure unacceptable." 52 *N. J.*, at 221. In spite of this reference, the refusal of relief at the second hearing was not based on inadequate size of the house. Consequently we conclude that if the exception or variance had been found to be otherwise acceptable, it would not have been denied on that ground.

Accordingly, the decision of the Board of Adjustment is reversed, and the matter is remanded with directions to grant a special exception or variance to the plaintiff.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.