PAUL NASH, NANCY NASH, THOMAS DESENA, JUNE DESENA, J. PAUL HELLSTROM, BRYON G. SHERMAN, GAIL SHERMAN, EARL D. CAUSEY AND HEATHER F. CAUSEY, PLAINTIFFS-APPELLANTS, v. BOARD OF ADJUSTMENT OF THE TOWNSHIP OF MORRIS, EDWARD ROCHFORD AND DIANA ROCHFORD, DEFENDANTS-RESPONDENTS, AND MYLES C. MORRISON, JR., AND LORRAINE P. MORRISON, DEFENDANTS.

Argued December 12, 1983—Decided April 19, 1984.

100

*Bernard F. Conway* argued the cause for appellants (*Stern, Steiger, Croland, Bornstein & Conway*, attorneys; *Bernard F. Conway and E. Neal Zimmerman,* on the brief).

*Anthony Ambrose, Jr.,* argued the cause for respondents Edward Rochford and Diana Rochford (*Ambrose & Monica,* attorneys).

*John A. Wyckoff* argued the cause for respondent Board of Adjustment of the Township of Morris (*James, Wyckoff, Vecchio & Pitman,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This is another in our series of zoning cases involving conditional relief to avoid undue hardship under *N.J.S.A.* 40:55D–70 c. For the latest such case, see *Commons v. Westwood Zoning Bd. of Adjustment,* 81 *N.J.* 597 (1980). Specifically, the issue here is, after there has been a determination that the property owner is entitled to a variance, what is the proper method of determining the fair and reasonable price for property in a one family residential zone that adjoining property owners must offer the owner to avoid the grant of the variance.

The Board of Adjustment of the Township of Morris (Board) granted a variance under *N.J.S.A.* 40:55D–70 c [1] to Diana and

---

140:55D-70. Powers

The board of adjustment shall have the power to:

* * * * * * * *

c. Where by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or by reason of exceptional topographic conditions, or by reason of other extraordinary and exceptional situation or condition of such piece of property the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the developer of such property, grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship, including a variance for a conditional use; provided, however, that no variance shall be granted under this subsection to allow a structure or use in a district restricted against such structure or use; and provided further that the proposed development does not require approval by the planning board of a subdivision, site plan or conditional use in conjunction with which the planning board shall review a request for a variance pursuant to subsection 47a. of this act; and

* * * * * * * *

No variance or other relief may be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and

Edward Rochford. Plaintiffs, adjoining property owners, instituted this action in lieu of prerogative writs to set aside the variance granted by the Board.

▌ To receive a variance under *N.J.S.A.* 40:55D–70 c, applicants must satisfy two criteria: (1) that they will suffer exceptional or undue hardship if the variance is not granted—the so-called positive criteria; and (2) that the variance will not result in a substantial detriment to the public good or the zoning plan—the so-called negative criteria.

The Board, the trial court, and the Appellate Division all agree that in this case the negative criteria had been satisfied; the granting of this variance would not damage the zoning plan or the public good.[2] We agree.

Property owners who meet the positive and negative criteria of the statute are entitled to a variance. In some circumstances, the court may decide to make the variance conditional on whether adjoining land owners offer to buy the property for its fair market value. This option to buy the property is a condition subsequent that may be imposed for the benefit of adjoining property owners. The question here is what is the proper standard to determine the property's fair market value in such cases.

the purpose of the zone plan and zoning ordinance. An application under this section may be referred by any appropriate person or agency, including the planning board pursuant to section 17 of this act, for its report; provided that such reference shall not extend the period of time within which the zoning board of adjustment shall act.

[2] In the trial court and the Appellate Division, plaintiffs alleged that the negative criteria had not been met because of *Galdieri v. Board of Adjustment Tp. of Morris*, 165 *N.J.Super.* 505 (App.Div.1979). In that case the court upheld a denial of the Board's variance to owners of an undersized lot located in the RA–35 zone on the same street as property in issue. Both the trial court and the Appellate Division in this case noted that the critical distinction here is that this lot is an isolated lot, not part of a larger tract as was the case in *Galdieri, supra.*

The Board concluded that the alternative offer must approximate the value of the property as a buildable lot assuming the variance has been granted. The trial court disagreed. It concluded that the owners were not entitled to a price based on the property's highest and best use, but only to a price based on a fair and reasonable use. As long as they received a fair and reasonable offer for the property, they could not be said to suffer undue hardship even though the property's value as a buildable lot was much greater.

The Appellate Division affirmed the trial court's judgment insofar as it upheld the grant of the variance, but reversed the court's finding as to a fair and reasonable offer price for the property. It held that the fair and reasonable price was the value of the property as though the variance had been granted.

We granted certification, 94 *N.J.* 529 (1983), and now affirm the judgment of the Appellate Division.

I

The property in question is Lot 5 in Block 343 on the tax map of the Township of Morris. It is an isolated undersized, vacant, corner lot, located in the RA–35 [3] single family detached residential zone under the Morris Township Zoning Ordinance. The lot was created by subdivision in 1932. From its creation until 1955, it conformed to the local zoning code, which required a minimum lot area of 15,000 square feet. In 1955, the area's zoning changed over to RA–35. Since then the lot has been nonconforming.

In 1976, defendant Dr. Myles C. Morrison, Jr. acquired the lot from his father by gift. In 1979, Dr. Morrison and his wife contracted to sell the property to the Rochfords for $35,000 with no contingency for a variance. A second contract dated August 6, 1979, superseded the first; in it, the Rochfords' promise to pay was conditioned on their ability to obtain the

---

[3]RA–35 requires a minimum lot area of 35,000 square feet.

variances necessary to build a single family residence on the lot. The contract's purchase price was reduced to $34,600.00, in part to reflect variance application costs. The Rochfords agreed to bear any risk of appeal of the variance approval.

On November 9, 1979, the Rochfords applied to the Board pursuant to *N.J.S.A.* 40:55D-70 c for the necessary variances. The home that the Rochfords proposed to build required the following variances:

|  | Required | Proposed |
|---|---|---|
| Lot Area | 35,000 sq. ft. | 18,594.05 |
| Per Family Area | 35,000 sq. ft. | 18,594.05 |
| Lot Width | 200 ft. | 110 ft. $\pm$ |
| Lot Frontage | 200 ft. | 110 ft. $\pm$ |
| Lot Depth | 200 ft. | 175 ft. $\pm$ |
| Front Yard | 75 ft. | 55 ft. |
| Rear Yard | 50 ft. | 28 ft. |

Prior to the hearing before the Board, the Morrisons, with the Rochfords' knowledge and approval, offered to sell the lot to the DeSenas, the owners of the adjoining lot, for $34,600, the same price offered to the Rochfords. The DeSenas rejected the offer, but made a counter-offer of $17,250, which the Morrisons rejected. The DeSenas then made a "final offer" of $22,000, which the Morrisons also rejected. At the hearing, Mr. DeSena testified that he was still willing to purchase the property for $22,000.

After hearings conducted over a four month period, the Board granted the necessary variances. The Board found that "there was no feasible means of aggrandizing the property since the adjoining lot on Westminister [the DeSenas'] was improved * * * and acquisition to the north was blocked by a sewer easement"; the "subject lot is the only isolated lot in single ownership"; a substantial number of nonconforming lots within the zone "established the character of the neighborhood and one more drop in the bucket will not add or detract from that condition"; and "the proposed use would not adversely

affect values in general * * *. Indeed, the testimony was that it would be of more benefit than a vacant lot." Further, the Board accepted the applicant's expert's testimony that assuming a variance was granted, "the lot in question had a value of between $31,000 and $34,000"; and if not buildable, presumably the only likely purchaser would be the owner of the adjoining lot. "[I]n that case, he [the expert] felt that a reasonable purchase price would be $17,000, although * * * he thought a fair price might be as high as $22,000 but he did not think on resale of the combined properties the higher price would be fully recovered."

In its resolution, the Board held that the "strictures on any other use than residence make it evident that the suitability of the premises in question is limited to a single family dwelling"; that the nonconformity of the subject lot resulted from "an historical process in which the owners (and applicant) and their predecessors in title played no culpable part; and, if not afforded relief, will suffer an unwarranted loss."

Thus, the Board concluded that the "positive" criteria of exceptional hardship under *N.J.S.A.* 40:55D-70 c were met. Since the DeSenas' offer would be at least $10,000 less than the established value of the premises, the Board held that it was not sufficient to relieve the hardship.

## II

A Board of Adjustment and a trial court have the power to grant a conditional variance. We specifically recognized this power in *Chirichello v. Zoning Bd. of Adjustment,* 78 *N.J.* 544, 555–56 (1979), where we stated:

It would certainly be consonant with the interest of all parties to deny a variance conditioned on the purchase of the land by adjoining property owners at a fair price. The immediate benefit to the adjoining property owners of maintenance of the zoning scheme and aesthetic enjoyment of surrounding vacant land adjacent to their homes is self-evident. The owner of the odd lot would suffer no monetary damage having received the fair value of the land.

*See also Harrington Glen, Inc. v. Municipal Bd. of Adjustment,* 52 *N.J.* 22 (1968) (implying power to grant conditional variance).

■■ After an applicant has satisfied both the positive and negative criteria, a Board of Adjustment or court may grant a conditional variance, an equitable remedy, that affords the adjoining property owners the opportunity to purchase the property for its fair market value. When an adjoining property owner is willing to pay a fair and reasonable price for the property, the applicant may either sell or retain the property. Should the applicant decide to retain the property, however, the court could find that since he is able to receive full price for the property, exceptional hardship no longer exists and, therefore, the requested variance should not be granted. If no fair and reasonable offer is made, however, the hardship continues to exist and, therefore, the court should grant the variance.

The dissent misconceives the essential purpose of the conditional variance. It fails to recognize that here the applicants have satisfied both the positive and negative criteria of *N.J.S.A.* 40:55D–70 c, thereby establishing their right to a variance. Thus, in the absence of anything more, the property owner gets the variance. The purpose of this condition is to enable the adjoining property owner to avoid the variance to which the property is entitled. By choosing to ignore the underlying theory of *N.J.S.A.* 40:55D–70 c and by failing to come to terms with this Court's most recent precedents, *Chirichello, supra,* 78 *N.J.* at 562–563 (Pashman, J. concurring), and *Commons, supra,* 81 *N.J.* at 608, the dissent has become mired in an analysis that has no basis in either New Jersey statutory or case law. Commencing with Justice Francis' decision in *Harrington Glen, Inc., supra,* 52 *N.J.* at 30, we have discussed the possibility that the opportunity of an owner to sell property at a fair price may preclude application of the hardship exception under *N.J.S.A.* 40:55D–70 c. We cautioned, however, in *Gougeon v. Borough of Stone Harbor,* 52 *N.J.* 212, 224 (1968), that:

Of course, no offer to purchase should play any part in the consideration of the case unless it represents at least the fair market value of a * * * lot on which a home could be built * * *.

Here, there is no dispute as to the various values placed on the property assuming it was buildable ($34,000) or assuming it was nonbuildable ($16,000–$17,000). The only question before this Court is what constitutes a fair offer.

In his concurring opinion in *Chirichello, supra,* 78 *N.J.* at 562, Justice Pashman set forth his view that, "the 'fairness' of any such offer must be gauged in relation to the fair market value of the premises *assuming that the variance had in fact been granted.*" [Emphasis in original.] In *Commons, supra,* 81 *N.J.* at 608, Justice Schreiber, writing for a unanimous court, indicated that

the preferred method to determine value is on the assumption that a variance had been granted so that a home could be constructed on the lot. See *Gougeon v. Stone Harbor Bd. of Adjustment,* 52 *N.J.* at 224, and *Chirichello v. Monmouth Beach Zoning Bd. of Adjustment,* 78 *N.J.* at 562 (Pashman, J., concurring). It is possible that other methods of valuation may be feasible. However, the parties have not briefed or argued the issue and accordingly we do not foreclose such possibilities.

■ Today, we eliminate any uncertainty in this area of the law. We hold that the proper standard of valuation in deciding the fair price to be offered to an owner to avoid hardship under *N.J.S.A.* 40:55D–70 c is the fair market value of the property assuming that all necessary variances have been granted. We find this to be the only measure of valuation that can truly relieve the hardship of an owner of an isolated lot who has satisfied the positive and negative criteria of *N.J.S.A.* 40:55D–70 c.

■ When a Board of Adjustment decides that an owner of a lot has satisfied both the positive and negative criteria, that owner is entitled to a variance. Under section c, if as here, the positive and negative criteria are met, the property owner is entitled to the value of the property with that variance. The provision for a hardship variance under section c represents a legislative determination that a property owner whose lot has

been zoned into inutility shall be allowed to build on it provided that the construction does not interfere with the intent of the community's zoning and planning scheme. This legislative scheme favors the building of homes where circumstances permit.

■ The dissent fails to appreciate the distinction between this statute which favors land use and the condemnation statute which provides owners with a remedy if their proposed use is shown to violate the intent of the zoning and planning scheme and no other use is possible. Valuation under the two statutes is different because the property is affected differently. Whereas property subject to condemnation is by definition zoned into inutility, property entitled to a section c variance is valuable as a buildable lot. Thus, the dissent's comparison between valuation methods in the two situations is specious at best. The properties must be valued differently since the one is valuable and useful to its owner and the other is not.

■ Finally, the dissent seems to imply that Dr. Morrison, by being allowed to sell his property based on its value as a buildable lot, is somehow being unjustly enriched because he received the lot as a gift from his father who acquired it as a nonbuildable lot. Implicit in this reasoning is the mistaken assumption that the term "hardship" refers to financial loss. By so reading the statute the dissent concludes that the majority has "read the positive criteria out of the statute" *post* at 120. This is clearly erroneous. The positive criteria remain intact and continue to refer to a lot's utility as a buildable lot. Financial loss alone has never been a basis for a finding of hardship under the statute. *See Commons, supra,* 81 *N.J.* at 605 ("undue hardship" involves underlying notion that no effective use can be made of property in the event a variance is denied).

■■ This argument also fails to recognize that it is only in the unusual case where the hardship is created by the property owner that the situation of the property owner rather than the

property itself becomes an issue. In all other cases it is the situation of the land and not that of the owner that is the critical factor. Here, since the Board of Adjustment held that the hardship was created neither by the owner nor by his predecessor in title, Dr. Morrison's acquisition of the lot is of no significance.

If we accepted the dissent's valuation method local neighbors and Boards of Adjustment would acquire undue power over and discretion as to the value of property. As Justice Pashman said in his *Chirichello* concurrence:

> Indeed, any other conclusion would be manifestly unjust. Were fair market value determined without assuming the existence of a variance, a plaintiff would rarely, if ever, meet the statutory criterion of "undue hardship." That is, if no use whatsoever can be made of a particular parcel of property, its "fair market value" would approach zero. Hence, any offer to purchase would effectively negate the existence of "undue hardship." Such a state of affairs would allow adjacent property owners to take advantage of a particular plaintiff's plight inasmuch as only they would be able to put the premises to productive use by merging it with their lands. [78 *N.J.* at 562–63.]

The conditional variance is intended to give adjoining property owners the opportunity to prevent the granting of a variance by paying the owner of the property that property's fair and reasonable market value. It should be clear, however, that the conditional variance is for the benefit of those who oppose it, not the owner. The owner who reaches this stage has satisfied both the positive and negative criteria of the statute and is entitled to a variance. Making the variance conditional gives the neighbors a choice that they would otherwise not have.

Applying our holdings to the case at bar, we find that the value of the property is $34,000, the value of the property with the variance. We find that the sum of $22,000 is inadequate to overcome the hardship to the Rochfords. We affirm the Appellate Division's judgment denying plaintiffs another opportunity to purchase the property for $34,000. Mr. DeSena was offered the property at $34,000 before the Board hearing; he refused that offer and there is no reason to give

him, or any of the other neighbors, a second chance at this late date. The Rochfords have already expended too much time, energy, and money on this project to allow others a chance to buy their property. The plaintiffs in this case cannot get "a second bite of the apple."

Judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

I disagree that the only means to relieve the owner of an undersized lot from zoning hardship is to force the neighbors to pay the after-the-fact price that the lot will command upon the granting of the variance. By conferring upon the undersized lot the value of a conforming lot the majority's theory reverses the role of the section (c) variance from relieving hardships to conferring windfalls; it lifts the value of the nonconforming lot by its bootstraps; and conflicts with our general views on what constitutes market value in the context of confiscatory zoning.

In 1961, Myles and Lorraine Morrison, the real parties in interest, bought a home on Overlook Road. Two years later, their neighbor, Viola Gaus, applied for a variance to build on a lot across the street from the Morrisons at the corner of Overlook and Westminster Place. Dr. Morrison told his father about this, and his father bought the lot at an undisclosed price. The trial court was unable to determine "whether or not the older Mr. Morrison purchased it just to pre[v]ent the variance or whether or not, in fact, he purchased it as a protective retirement home." At any rate, the lot was still vacant in 1976 when Mr. Morrison gave the lot to his son. In 1979, Myles and Lorraine Morrison sold their house on Overlook Road to the plaintiffs Causey for $187,500, but never told them about their plans to develop the property across the street. Mr. Causey testified that one of the factors that led them to buy the house was the decision in *Galdieri v. Board of Adj. of Tp. of Morris*, 165 *N.J.Super.* 505 (App.Div.1979), which had deemed a similar

lot (in fact, the lot on the other side of the DeSenas' house) undevelopable.[1]

Shortly after entering the contract with the Causeys, the Morrisons entered a contract with the Rochfords to sell the property to them for $35,000 without contingencies, but the parties amended the contract to include mortgage and variance contingencies and lowered the price to $34,600. Their attorney wrote to the DeSenas, the adjoining neighbors, and told them that Dr. Morrison had received an offer of $34,600 for the lot, and asked the DeSenas if they wished to match that offer. The DeSenas were not told that the $34,600 sale was contingent on the granting of a variance. The DeSenas were unwilling to pay $34,600 for the lot but did agree to pay $17,000 for it. They later increased their offer to $22,000 before the Zoning Board hearings.

At the hearing before the Zoning Board of Adjustment the applicants' expert witness admitted that $17,000 was a fair price for the neighbors to pay. The Board, however, found it inadequate because "the value of the lot as a building lot is in excess of $30,000."

The trial court correctly interpreted the prior decisions of this Court, holding that it "defeats the very purpose of the hardship" to equate the value of an unbuildable lot with that of a buildable lot. It therefore concluded that since the price of $22,000 represented "fair and reasonable value," there was in fact no hardship and no entitlement to a variance. Without the speculative enhancement of a variance the court would have done justice by requiring prompt payment of the $22,000 or an award of the variance.

I

It is hard to develop a sense of outrage over the zoning decision. The lot in question is almost one-half acre in size and

---

[1]The Causeys' complaint against the Morrisons for consumer fraud under *N.J.S.A.* 56:8–2 and 56:8–19 was severed from this prerogative writ action.

the proposed dwelling would not be closer than 25 feet from the DeSenas. Nonetheless, it is a unique neighborhood in the Township, involving a small cul-de-sac development almost entirely surrounded by an open space governmental zone. Judge Conford described the neighborhood in *Galdieri* as a "semi-rural suburban atmosphere" not unlike a "small country estate." 165 *N.J.Super.* at 513. Its residents are entitled to consistent application of legal principle. In my view, it is inconsistent with accepted legal principle to equate the speculative value of land, made contingent upon zoning change, with the fair value of the land.

Analysis of the issue must begin with the trilogy of opinions written by Justice Francis: *Harrington Glen, Inc. v. Municipal Bd. of Adj. of Leonia,* 52 *N.J.* 22 (1968); *Gougeon v. Board of Adj. of Stone Harbor,* 52 *N.J.* 212 (1968) (*Gougeon I*); and *Gougeon v. Board of Adj. of Stone Harbor,* 54 *N.J.* 138 (1969) (*Gougeon II*). In *Gougeon I* the Court held the board of adjustment's findings of fact insufficient to deny a variance for an undersized lot. It therefore remanded the matter to the zoning board for reconsideration of the application.

In connection with the remand, the Court suggested that the board could consider whether a "binding offer is made on the record to pay plaintiff the fair market value of his lot * * *. If plaintiff refuses such a fair and reasonable offer, the Board may conclude that his case falls short of the exceptional or undue hardship which justifies relief." 52 *N.J.* at 224. The essence of *Gougeon I* and *II* is not that the owner of an undersized lot shall receive the contingent value of the land, but that the existence of a fair market value offer is an appropriate factor for the board to consider in deciding whether the owner would suffer undue or exceptional hardship by enforcement of the letter of the zoning ordinance. In *Gougeon II* the Court directed the issuance of a variance or exception for unique waterfront land in Stone Harbor: "Gougeon's lot, which has been in his family for 33 years is irreplaceable." 54 *N.J.* at 146. The Court concluded that "[i]n view of the unusual circumstanc-

es in the case," relief should be granted in spite of the neighbor's offer to purchase the lot. Consequently, it did not "reach the issue of the adequacy of the value of the Gougeon lot as fixed by the Board of Adjustment." *Id.* at 148.

In *Gougeon I* Justice Francis described the unique zoning ordinance of Stone Harbor. While allowing 30-foot frontage, its sideyard restrictions of 10 feet on each side would result in 10 foot-wide houses—"an impossible prospect." 52 *N.J.* at 216. There was a special exception provision in the ordinance that allowed lots in existence before the adoption of the zoning ordinance five-foot sideyards, yielding a 20-foot house. *Gougeon* was, in that sense, not a true variance case but a special exception case. In addition the evidence showed that an overwhelming number of the lots in the community were of the same size as this lot, that is, 30 × 110 feet. *Id.* at 217. It was in that context that Justice Francis said "no offer to purchase should play any part in the consideration of the case unless it represents at least the fair market value of a 30' × 110' lot on which a home could be built, *i.e.*, at least the front-foot value of conforming lots in the general residential area." *Id.* at 224.

Both *Gougeon I* and *Gougeon II* built upon the Court's decision in *Harrington Glen.* That case was the flip side of *Gougeon* and the present case. The issue there was whether the applicant for the undersized lot variance can avoid hardship, not by selling the lot, but by adding to it. Justice Francis observed that if the negative criteria of the statute cannot be satisfied because of the size of the lot, "the existence of land adjoining the applicant's property which is available for purchase at a fair market price may provide the solution." 52 *N.J.* at 30. Further, in considering the question of an offer to purchase the lot, the Court said: "If that neighbor or any other interested person is willing at the time of the renewed hearing to buy Pou's lot at a fair price—for example, at the front-foot value of conforming lots in the general residential area—that fact may be considered on the issue of hardship." *Id.* at 31.

From both of these cases we may distill that the analysis was not based on the price the lot would be sold for, but on a comparable front-footage of *conforming* lots. Thus, if a 200-foot building lot would sell for $30,000, it would appear that a 100-foot building lot should be valued at $15,000 for purposes of variance.

The factor that drives the variance in the *Harrington Glen* analysis is the issue of confiscation:

> Denial of permission to build a home upon the lot deprives it of all productive or beneficial use. The only distinction between such zoning restriction and an actual taking by the municipality is that the restriction leaves the owner with the burden of paying taxes on the property, while the outright taking relieves him of that burden. Ordinarily restraint upon all practical use, such as that which would follow from denial of a variance, is spoken of in terms of confiscation. [52 *N.J.* at 29.]

To avoid confiscation, there must be a fair, but not speculative, market for the property. I do not believe that the concept is difficult to apply. The New Jersey Assessors' Manual prescribes standard criteria for residential assessment. Conforming front-footage of a building lot is assessed at a standard value. The excess frontage is assessed at a lesser percentage. 1 Real Property Appraisal Manual for New Jersey Assessors 61–62 (3d ed. 1978). These principles will ordinarily provide a reasonable guide for zoning boards.

In the last analysis, we must continue to repose a sound measure of discretion in zoning boards to evaluate the issue of fair value. In *Gougeon II* the Court emphasized that even a fair value offer may not resolve the matter since the Board remains free to determine whether, under all the circumstances, the land is so unique that a variance should be granted. 54 *N.J.* at 148–49. As the trial court observed, our zoning boards exercise extraordinary powers of judgment in both section (c) and (d) cases, in reviewing the economic aspects of development plans, technical design features, drainage, traffic, sewerage, lighting, environmental impact, and the like. Compared with the judgments of regional and local housing needs that planning officials may make under *N.J.S.A.* 40:55D–25 and –76,

deciding the fair value of a vacant nonconforming lot does not seem insurmountable.

Most commentators approach the issue in terms of fair or reasonable value. *See* 2 N. Williams, American Planning Law § 41.02, at 148 (1974) (developer of isolated lot located between two developed lots "should be required * * * to try to sell this parcel at a reasonable price to one, or preferably to both, of his neighbors." (footnote omitted)); 8 E. McQuillin, The Law of Municipal Corporations § 25.168, at 600 (3d ed. 1983); 2 A. Rathkopf and D. Rathkopf, The Law of Zoning and Planning § 32.09[1], at 32–22 (4th ed. 1978) (comparing New York and New Jersey approaches). *But see* 3 R. Anderson, American Law of Zoning § 18.54, at 292 (2d ed. 1977).

Courts have focused on the fair value of a particular substandard lot in deciding whether a variance should be granted or denied. Thus, in *Goslin v. Zoning Bd. of App. of Park Ridge*, 40 *Ill.App.*3d 40, 351 *N.E.*2d 299 (1976), the lot owner was denied a variance since a neighboring landowner was "a willing buyer" who offered "a price which would have permitted [the lot owner] to recoup his actual investment." 40 *Ill. App.*3d at 42, 351 *N.E.*2d at 301. *See also Grobman v. City of Des Plaines*, 14 *Ill.App.*3d 996, 303 *N.E.*2d 821 (1973), aff'd, 59 *Ill.*2d 588, 322 *N.E.*2d 443 (1975) (ordinance not confiscatory since neighbor offered to purchase lot at fair market value price determined by real estate broker); *cf. Harper v. Zoning Hearing Bd. of Ridley Tp.*, 21 *Pa.Commw.* 93, 343 *A.*2d 381 (1975) (refusal to sell to neighbor does not prohibit granting of variance if fair price not established).

I find the approach of New York's highest court persuasive and practical. In *Matter of Cowan v. Kern*, 41 *N.Y.*2d 591, 363 *N.E.*2d 305, 394 *N.Y.S.*2d 579 (1977), an attorney purchased a substandard lot at a tax sale and sought a variance, claiming financial hardship. The lot was worth $7500 with the variance and only $1000 without. The Court of Appeals found that for assessing financial hardship "the inquiry should properly focus

upon the value of the parcel as presently zoned, rather than upon the value that the parcel would have if the variance were granted." 41 *N.Y.*2d at 597, 363 *N.E.*2d at 309, 394 *N.Y.S.*2d at 583. Since there was no proof as to what the lot owner paid, "there is no predicate which would support a finding of economic hardship." *Id.*[2]

Dr. Morrison's father purchased the lot in 1963, eight years after the zoning change to RA–35. While there was no evidence as to the original purchase price—and, therefore, no basis for saying anyone suffered " 'an unwarranted loss' " (*ante* at 105)—it seems clear from the circumstances that the price paid was for an unbuildable, substandard lot. The Court holds today that the land should be valued as if it were a buildable, standard lot. As no justifiable expectations of Dr. Morrison or his father have been thwarted, and as he has *"the exact same options* for his land as when the tract first came into his possession," *Negin v. Board of Bldg. and Zoning Appeals of Mentor,* 69 *Ohio St.*2d 492, 500, 433 *N.E.*2d 165, 171 (1982) (Krupansky, J., dissenting) (emphasis in original), I find the Court's decision lacking in proof of hardship.

If the Township of Morris condemned this property under its powers of eminent domain, it would not pay the price the Court sets today. In *State v. Gorga,* 26 *N.J.* 113 (1958), Chief Justice Weintraub addressed the question of whether fair market value

---

[2]The Court further found that the financial hardship was self-created since the attorney bought the property aware of the zoning limitations and at a bargain price:

> [I]t is reasonable to assume that the price * * * reflected the value of the property as restricted by the ordinance. Hence, the granting of the variance would, like as not, result in a windfall to petitioner well above the minimal price paid at the tax sale. [*41 N.Y.*2d at 597, 363 *N.E.*2d at 309, 394 *N.Y.S.*2d at 583.]

Under New Jersey law the successor in title to one who has not created the hardship does not lose the predecessor's rights. *Wilson v. Borough of Mountainside,* 42 *N.J.* 426, 452–53 (1964).

in a condemnation proceeding may be affected by the prospect of an amendment of the zoning ordinance:

> The important *caveat* is that the true issue is not the value of the property for the use which would be permitted if the amendment were adopted. Zoning amendments are not routinely made or granted. A purchaser in a voluntary transaction would rarely pay the price the property would be worth if the amendment were an accomplished fact. No matter how probable an amendment may seem, an element of uncertainty remains and has its impact upon the selling price. At most a buyer would pay a premium for that probability in addition to what·the property is worth under the restrictions of the existing ordinance. In permitting proof of a probable amendment, the law merely seeks to recognize a fact, if it does exist. In short if the parties to a voluntary transaction would value as of the date of taking give recognition to the probability of a zoning amendment in agreeing upon the value, the law will recognize the truth. [*Id.* at 117.]

*See also State v. Silver,* 92 *N.J.* 507, 517–18 (1983) (common ownership and future use relevant factors in assessing fair market value of condemned properties); *State v. Market Associates,* 134 *N.J.Super.* 282, 286 (App.Div.1975) ("The value must be determined in the light of the attendant facts and circumstances as of the date of the taking—including the existence of the uninvalidated zoning regulations, and the reasonable probability of their being changed by reason of their likely invalidity."); 4 Nichols' The Law of Eminent Domain § 12.322[1], at 12–657 (3d ed. 1981) (market value of condemned property "must not be evaluated as though the rezoning were already an accomplished fact. It must be evaluated under the restrictions of the existing zoning and consideration given to the impact upon market value of the likelihood of a change in zoning." (footnote omitted)); *cf. Sage v. Bernards Tp.,* 5 *N.J.Tax* 52 (1982), aff'd, 6 *N.J.Tax* 349 (App.Div.), certif. denied, *N.J.* (1984) (tax assessor properly considered value of land in light of court order mandating zoning change).

I see no reason why the Court should treat valuing for exceptional hardship under section (c) differently from the way it treats eminent domain or tax assessments. The consistent rule has been that value should approximate fair market value as closely as possible. Here we have a willing buyer in the DeSenas, who agreed to pay $22,000, five thousand dollars more than the "fair price" set by the sellers' expert. I remain

unconvinced that some value other than fair market value should be employed. If the sellers are not willing to sell at a price that is greater than would be paid for condemnation, or that would be assessed for tax purposes, or that their own expert denominated fair, I fail to see why this neighborhood should pick up the tab.

## II

I recognize, as does the majority, that a hard and fast rule will have the advantage of making cases easier for the boards to handle. Still, there will remain the necessary inquiry into the arm's length nature of the transaction, to be assured that the zoning process is not being abused. A further note of caution is in order, however, with respect to the theory of the majority opinion. To the extent that it equates confiscatory zoning with the loss of the highest and best use of the land, it loses sight of developing trends in land use law. In *Penn Central Transp. Co. v. City of New York*, 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631 (1978), the Court made clear that landmark designation that restricts the use of land to less than its highest use is not a taking requiring compensation. Similarly, in *Agins v. City of Tiburon*, 447 *U.S.* 255, 100 *S.Ct.* 2138, 65 *L.Ed.*2d 106 (1980), a unanimous Court rejected a challenge to a California law that restricted development possibilities on the challengers' land to single-family homes.

Our lower courts have sustained against facial challenge preservation zoning under the Pinelands Protection Act, *N.J. S.A.* 13:18A-1 to -24. *See Orleans Builders & Developers v. Byrne*, 186 *N.J.Super.* 432, 446 (App.Div.1982) ("Under general principles a property owner is barred from any claim to a right of inverse condemnation unless deprived of all or substantially all of the beneficial use of the totality of his property as the result of excessive police power regulation." (citing *Penn Central*); Note, *New Jersey's Pinelands Plan and the "Taking" Question*, 7 *Colum.J.Envtl.L.* 227 (1982). Our Wetlands

Act of 1970, *N.J.S.A.* 13:9A–1 to –10, has also been sustained. *Sands Pt. Harbor, Inc. v. Sullivan*, 136 *N.J.Super.* 436 (App. Div.1975). To the same effect is *Morris Cty. Land Improvement Co. v. Township of Parsippany-Troy Hills*, 40 *N.J.* 539 (1963), where the Court struck down a zoning ordinance that unconstitutionally restricted the use of swampland, but added: "It is sufficient if the regulations permit some reasonable use of the property in the light of the statutory purposes." *Id.* at 557. Future courts will have to deal with farmland protection zoning and solar zoning. In each of these prior areas, however, zoning regulations that seek to preserve either open space or the characteristics of a community have been sustained so long as reasonable use of the owner's property is available. Courts have not equated the issue of confiscation with the highest and best use of the land, but have asked whether there is a fair market use.

Although the undersized lot variance seems at first removed from the preservation of Grand Central Terminal or of the Pinelands or Wetlands, its conceptual basis is the same. Large lot zoning is not to be used to achieve economic segregation, *see Home Builders League of So. Jersey, Inc. v. Township of Berlin*, 81 *N.J.* 127 (1979) (such floor area requirements are invalid), but rather should be rooted in open space preservation. *Southern Burlington Cty. NAACP v. Mount Laurel Tp.*, 92 *N.J.* 158, 260 (1983). It is only when such land is zoned into inutility, *Harrington Glen*, 52 *N.J.* at 29, that relief is afforded.

The majority rejects the suggestion that we try to reconcile our holding with comparable concepts of restrictive zoning. The Court finds the two different: "Whereas property subject to condemnation is by definition zoned into inutility, property entitled to a section c variance is valuable as a buildable lot." *Ante* at 108.

I remain unpersuaded. This analysis not only assumes the answer to the question presented but also ignores the record in this case. The same assumption occurs in the way the majority

frames the issue: "[A]fter there has been a determination that the property owner is entitled to a variance, what is the proper method of determining the fair and reasonable price * * * that adjoining property owners must offer the owner to avoid the grant of the variance [?]" *Ante* at 101. Of course if the property is entitled to a section (c) variance it is valuable as a building lot. But you don't get a variance unless you have a hardship. You don't have a hardship when you get fair value. For the record in this case establishes that the only hardship that the Board found was that there was no offer to pay "the value of the lot as a building lot." (See Appendix annexed hereto). The Court ignores this record fact in creating its syllogism.

The majority seems to be converting every undersized lot that meets the negative criteria into a buildable lot. If that is the substantive reasoning of the case, the import of today's decision is far-reaching: If the owner of an undersized lot is able to get a variance simply by satisfying the negative criteria and by showing that the lot is not worth as much as it would be with a variance, the Court has effectively read the positive criteria out of the statute in these cases.

I would therefore follow our prior precedents and harmonize our decisional law on confiscatory zoning and open space preservation with undersized lot zoning. I believe that the trial court correctly concluded that a $22,000 offer represented fair value for the lot and that its payment would avoid a confiscatory zoning loss. Finally, I would not permit the Morrisons' actions to cause prejudice to the Rochfords. The Morrisons, having employed the zoning process to establish the price of the lot, should not receive more than the zoning process will allow. I would therefore modify the trial court's judgment to that end and reverse the judgment of the Appellate Division.

HANDLER, J., joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices SCHREIBER, POLLOCK and GARIBALDI—4.

*For reversal*—Justices HANDLER and O'HERN—2.

## APPENDIX

BE IT FURTHER RESOLVED that it is noted by the Board that the RA–35 zone permits uses other than residences, such as agricultural, public and semi-public uses; but the strictures on any other use than a residence make it evident that the suitability of the premises in question is limited to a single family dwelling. The non-conformity of the subject lot is due to an historical process in which the owners (and applicant) and their predecessors in title played no culpable part; and, if not afforded relief, will suffer an unwarranted loss. It has been argued that the motive in acquiring the lot was to prevent its use by the then owner for the very purpose now intended and that therefore the intended use should be prohibited. That argument is conjecture and, even if well-founded, overlooks the fact that it did not create the status of the lot and the investment made cannot be appropriated to the benefit of others. It is also argued that a bonafide and adequate offer was made by the adjoining lot owner. The Board does not question that the offer is bonafide, but in its opinion it is inadequate to relieve the hardship that would be visited on the owner if the variance were denied. There is uncontroverted opinion testimony in the record that the value of the lot as a building lot is in excess of $30,000.00 and, in fact, a contract purchaser (the applicant) agreed to pay $34,600.00 for it.

As to the negative criteria, the Board is of the opinion that they have been satisfied. Both of the professional planners who testified seemed to agree substantially as to the facts attributing to the character of the existing neighborhood, including the salient fact that the lot was the only "isolated" lot in the zoned area. They differed only in their conclusion. The Board recognizes both as well qualified but in expressing its

opinion draws upon its own expertise and discretion. It seems to the Board that, impressed with the small area involved, the extent of existing non-conformities has already established the character of the neighborhood and one more "drop in the bucket" will not add to or detract from that condition. It is true that, because of the smallness of the zone, the zone plan may be vulnerable to deviations on the "domino" theory, but the fact is that this is the only "isolated" lot in the zoned area. A weighing of the facts and circumstances in this case results in the conclusion that, assuming that there are any adverse effects, they are de minimus. Concerning the effect of the development of the lot on values in the neighborhood there is uncontroverted testimony not only that the proposed use would not adversely affect values in general, but it would not impair the value of any structures around it, including the adjacent property owner. Indeed, the testimony was that it would be of more benefit than a vacant lot.

BE IT FURTHER RESOLVED that, for the reasons given, the requested variances are granted.