165 N.J. Super. 505 (1979)
398 A.2d 893
FRANK GALDIERI AND LOUISA GALDIERI, HIS WIFE, PLAINTIFF-APPELLANT,
v.
BOARD OF ADJUSTMENT OF THE TOWNSHIP OF MORRIS, MORRIS COUNTY, NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1978.
Decided January 2, 1979.
Before Judges CONFORD, PRESSLER and KING.
Mr. Carl F. Wronko argued the cause for appellant (Messrs. Fullerton & Porfido, attorneys).
Mr. John A. Wyckoff argued the cause for respondent (Messrs. James, Wyckoff, Vecchio & Thomas, attorneys).
*506 The opinion of the court was delivered by CONFORD, P.J.A.D.
This is another in the long series of cases in our courts involving application for variance from the bulk provisions of a municipal zoning ordinance where a lot was once in conformity with ordinance requirements but was rendered nonconforming by reason of later upgrading of the bulk specifications. For the latest such case see Miriam Homes, Inc. v. Perth Amboy Bd. of Adj., 156 N.J. Super. 456 (App. Div. 1976), aff'd o.b. 75 N.J. 508 (1978).
In the present case there are two applications for variance under N.J.S.A. 40:55D-70(c),[1] one by the owners of an undersized lot and the other by the conditional contract purchaser from the owners who is a contractor intending to build a two-story home on the 110-foot lot to sell for $110,000 if the variance is granted. Since the second application will be mooted if the first is held to have been justifiably denied, we initially confine our discussion to the merits of the owners' case. The Board of Adjustment of Morris Township denied the variance, and the Law Division affirmed. Hence this appeal by the owners.
The owners of the lot for which a variance is sought also own an adjoining 110-foot lot on which they built a home in 1952 which they still occupy. The subject lot was acquired later, but prior to the zoning upgrading. Current minimum lot frontage under the zoning ordinance is 175 feet. Substantially all the physical and historical facts affecting the issue before us are set forth in the findings and conclusions of the board of adjustment. Subject to slight qualifications to be noted, the findings of fact are adequately supported by the evidence adduced at the hearing held by the board. The findings are as follows:
*507 1. Both lots involved, if treated as a single parcel, have a frontage on Westminster Place (a public street) of 220 feet and a depth of 170 feet, with an area of 37,400 square feet.
2. Lots 2 and 3 [the locus in quo] each have a frontage on Westminster Place of 110 feet and a depth of 170 feet. They each have an area of 18,700 square feet, which is approximately 53% of the required area.
3. Said lots are located currently in an RA-35 residential zone. Said zone requires a minimum lot area of 35,000 square feet, a minimum lot width of 175 feet, a minimum lot depth of 175 feet, a minimum front yard setback of 75 feet, a minimum side yard of 30 feet but both side yards must equal 75 feet, and a minimum rear yard of 25 feet. The maximum building coverage allowed is 15%, maximum height of the building is 35 feet and may not exceed 2 1/2 stories, nor may the maximum livable area exceed 3,000 square feet.
4. The particular RA-35 zone in which the premises are located is surrounded on three (3) sides by an Open Space/Government Use Zone and on the fourth by lands in the Town of Morristown and is relatively small compared to said surrounding zone. Prior to 1955, this zone was part of a much larger zone requiring a minimum lot area of 15,000 square feet, a minimum lot width of 100 feet, a minimum lot depth of 150 feet, a minimum front yard setback of 50 feet, a minimum side yard of 10 feet and a minimum rear yard of 25 feet. In 1955, this larger zone was divided into two zones; one zone designated R-3 (a relatively small portion of the entire zone) contained essentially the same requirements as the previous zone, and one zone designated R-2 contained essentially the same requirements as the present RA-35 zone in which the premises in question are located. In 1972, the R-2 zone was substantially reduced, a portion thereof was added to the R-3 zone and an extensive area was designated as an office and laboratory zone. In 1974, the R-2 zone was further reduced in size, the large portion was designated as an Open Space/Government Use Zone and a small area was added to the R-3 zone (redesignated RA-15). What remained of the R-2 zone was what is now the present RA-35 zone. The neighborhood in question constitutes all of the area included in this RA-35 zone and consists of property abutting Westminster Place, Overlook Road, Longwood Road and Edgewood Road. It consists of a neighborhood access to which is only obtained through Morristown by the use of Overlook Road which, generally speaking, has a north-south axis, and two short side streets, Longwood Road to the south and Westminster Place to the north. Edgewood Road to the east would parallel Overlook Road but it is apparently not a travelled street; the testimony suggested it may have been vacated and the zone map delineates it with dashed lines.
5. The testimony established that Lot 3 was purchased by the Galdieri's in September of 1950 and Lot 2 was purchased in March of *508 1952. The presently existing dwelling was built on Lot 3 in 1951 and was completed prior to the acquisition of Lot 2. The applicants' daughter testified that the purpose leading to the purchase of Lot 2 was to provide a site for the building of a house for her when she married. Over the years, Lot 2 was left unimproved except for some gardening, and the weeds and brush were kept cut back. At the time of the purchase of these lots, the dwellings on Lots 1 and 4 [see par. 7 infra] were in existence.
6. At the time that Lots 2 and 3 were acquired they were in a zone requiring minimum size lots of 15,000 square feet with a minimum frontage of 100 feet. These lots, with others, were laid out on a map dated December, 1931 and have been so delineated on the Township Tax Map for many years. The proposed use of Lot 2 would substantially comply with the area, bulk and yard requirements of the current RA-15 residential zone (except for the maximum livable area requirement) which would be similar to the zoning in effect when said lot was purchased.
7. There are five lots, including the lots in question, located on the northeasterly side of Westminster Place between Overlook Road and Edgewood Road. Lot 1, adjoining Lot 2 on the southeast, is in separate ownership and is of the approximate size of Lot 2 and is improved by a dwelling. Lot 4, adjoining Lot 3 on the northwest is identical in size and contains a dwelling and garage and is held in separate ownership. Lot 5, to the northwest of Lot 4, is located at the corner of Westminster Place and Overlook Road, and is approximately of the same size as the other lots, is vacant and is also held in separate ownership.
8. Directly across the street from the Galdieri's house is a single parcel consisting of three (3) of the original mapped lots, the center lot being improved by a dwelling. The remaining lot fronting on the southwesterly side of Westminster Place is part of a larger parcel extending along Edgewood Road. The applicants' planning expert referred to a similar situation on Overlook Road where there is a dwelling and a garage on a parcel consisting of three (3) lots and facing them across the street there are dwellings on single mapped lots.
9. There are 27 parcels located within the RA-35 zone in question. The experts representing both the applicant and objectors agreed that the number of dwellings built on parcels consisting of single lots (approximately 18,700 square feet) and those built on parcels consisting of two or more lots were about equal. The objectors expert pointed out that area-wise the smaller parcels constituted less than one-third of the total area of the neighborhood developed for residential purposes. It was his opinion that the general trend in the neighborhood was to larger, not smaller, parcels, and that, for preservation of values, future development should be larger parcels, not smaller. Testimony indicated that, as part of the larger parcels, *509 there are between six and eleven vacant lots which conform to the area requirements of the pre-1955 zoning regulations and which represent potential further developments in the area upon the granting of variances with respect to minimum lot size, similar to the variance request of the applicant's herein.
10. There has been no development in the RA-35 zone in question since 1955 when the present zoning requirements were first established. During this time, there has been no action in contravention of these requirements by the Planning Board, the Township Committee or the Board of Adjustment. Since 1955, a number of residents have accumulated parcels conforming to the existing zone requirements in reliance on these requirements and on the fact that they had been maintained for a long period of time.
11. The applicant for variance of the yard requirements testified that he intended to build a two-story colonial dwelling unit approximately 2,700 square feet of living space, which he estimated would sell for about $110,000.00. His position was that if he was required to meet the yard requirements he could not build a saleable house; that the variances requested would permit the location of the proposed house to correspond to the structures existing on the adjoining lots. If the front yard zone requirements were met, the front of the proposed home would be at the rear line of the existing dwellings on either side.
12. The Morris Township Planning Board granted subdivision approval, recreating the two lots in question, on February 22, 1977, subject to the necessary variances being granted.
After setting forth the findings aforestated the board concluded:
BE IT FURTHER RESOLVED that, on the basis of the facts generated on the record, the Board is of the opinion that the applicants' Galdieri have not sustained the burden of proof that the strict application of the zone requirements affecting their premises would result in exceptional and undue hardship peculiar to their lot. Further, it is the opinion of the Board that the granting of the variances would constitute a substantial detriment to the public good because it would decrease the general level of desirability and value of the neighborhood constituting the entire area of the zone in which said premises are located. Because of the required small area of the zone and the established characteristics of the area the requested variance would substantially impair the intent and purpose of the zone plan and zoning ordinance.
BE IT FURTHER RESOLVED that for the foregoing reasons the application of Frank and Louisa Galdieri is DENIED.
*510 Having thus denied the application of the owners, the application of the contractor was also denied as moot.
It is pertinent first to consider whether plaintiffs' application could reasonably have been regarded by the board as not demonstrating that strict application of the minimum zoning requirements to their lot would inflict "peculiar and exceptional practical difficulties to or exceptional and undue hardship" upon them, as required by the statute. N.J.S.A. 40:55D-70. The only hardship demonstrated is that plaintiffs cannot sell the lot as an eligible individual building lot. But they have an assemblage of two lots which is inherently susceptible of use as an integral home site, and this assemblage had in fact been used as such by them for many years before they became too old and infirm to continue to trim and use the subject lot as a garden. See Ramsey Assoc. v. Bernardsville Bd. of Adj., 119 N.J. Super. 131, 134 (App. Div. 1972); Bove v. Emerson Bd. of Adj., 100 N.J. Super. 95, 98 (App. Div. 1968). Alternatively, part or all of the lot is functionally utilizable to enlarge the homesite of plaintiffs' neighbor, Mr. Sherman, to the southeast. See Holman v. Norwood Bd. of Adj., 78 N.J. Super. 74 (App. Div. 1963). Further, whatever hardship plaintiffs withstand in not being able to sell the lot as a building site is not "peculiar" or "exceptional" to them, see N.J.S.A. 40:55D-70, as it appears that a number of other homeowners in the area whose homes were originally built on 100 or 110-foot lots acquired vacant adjacent acreage to enlarge their homesites in accord with the upgraded zoning but might, parallel with plaintiffs' plea, request a variance to build on such lots if they changed their minds and chose to cash in the sales value of the extra lots rather than continue to subserve the existing zone plan for 175-foot frontages.
A more highly profitable use of land is not of itself a good reason for a hardship variance. Brandon v. Montclair, 124 N.J.L. 135, 149-150 (Sup. Ct. 1940), aff'd 125 N.J.L. 367 (E. & A. 1940); Hill Homeowners v. Passaic *511 Bd. of Adj., 129 N.J. Super. 170, 175 (Law Div. 1974), aff'd 134 N.J. Super. 107 (App. Div. 1975); Shell Oil Co. v. Shrewsbury Bd. of Adj., 127 N.J. Super. 60, 65 (App. Div. 1973), rev'd on dissenting opinion, 64 N.J. 334, 336 (1974).
To be distinguished are cases where the owner holds an undersized isolated lot which cannot be enlarged by acquisition of adjoining lands. Harrington Glen, Inc. v. Leonia Bd. of Adj., 52 N.J. 22 (1968); Gougeon v. Stone Harbor, 52 N.J. 212 (1968); Griffin Constr. Corp. v. Teaneck Bd. of Adj., 85 N.J. Super. 472 (App. Div. 1964), certif. den. 44 N.J. 408 (1965). In the Harrington Glen case, supra, the Supreme Court observed that where a prima facie hardship was presented because of the isolated ownership of an undersized lot but a variance would affect the zone scheme and plan, "the existence of land adjoining plaintiff's property which is available for purchase at a fair market price may provide the solution." 52 N.J. at 30. On the basis of that rationale it did not constitute a mistaken exercise of discretion for the board of adjustment to have denied the instant application for variance as the owners here already own adjoining land sufficient to render the combined assemblage in substantial compliance with the bulk zoning requirements. The fact that the dwelling is not situate in the center of the homesite should not of itself be considered an exceptional and undue hardship since that situation is frequently found in modern arrangements of suburban homesites accommodating gardens, lawns, swimming pools, etc. on the grounds. See the criticism of a contrary view in Cunningham, "Control of Land Use in New Jersey by Means of Zoning," 14 Rutg. L. Rev. 37, 85 (1959).[2]
*512 We turn to the other principal issue  whether it was arbitrary or capricious for the board of adjustment to conclude that the grant of this variance would constitute a substantial detriment to the zone scheme and plan and to the public good. We point out preliminarily, as seen above, that these conclusions were attended by a full set of subordinate findings of fact. Cf. Griffin Constr. Corp. v. Teaneck Bd. of Adj., supra, 85 N.J. Super. at 475. The gradual development of local zoning policy for larger lot zoning in this small-sized R-35 zone is apparent from the evidence. The bulk requirements for dwelling lots in this neighborhood have stood since 1955. A thorough planning study involving extensive hearings in 1972 resulted in a 1974 master plan and an accompanying revision of the zoning ordinance which retained the previous minimum bulk requirements for the here pertinent area. Sector 2 of the master plan covered this section of town. An objective of the planning for that sector was stated to be "to expand low density residential west of James St. and north of Springwood Road" [this area] and "to protect the established residential neighborhood from gradually introduced incompatible uses and densities."
The homes in the pertinent area had all been built prior to 1955, most of them on 100' to 110' lots, but, as we have seen, a number of homeowners had acquired adjacent lots or portions thereof to come into substantial or closer accord with the upgraded lot size specifications. Thus, although at the time of this application the number of homesites on the smaller lots was slightly larger than those on the larger assembled plots, the area encompassed by the larger homesites was about double that of the smaller. Compare such cases as Burke v. Spring Lake Bd. of Adj., 52 N.J. Super. 498 (App. Div. 1958), where the size of the subject lot was characteristic of almost the entire pertinent area. Most of the smaller homesites are on Overlook Road, around the corner and out of sight of Westminster Place, where the subject property is situated. The general area and its environs *513 are heavily wooded, and the distinct impression is of a semi-rural suburban atmosphere (described by one witness as the "small country estate" character).[3]
On Westminster Place itself, the setting of the existing five homes is such as substantially to produce the spacious effect envisioned by the current zoning restrictions. There are only two homes on the southwest side, across from the subject lot, each on homesites considerably larger than the frontage and area minimums. Only on the northeast side of the street is there a degree of nonconformance, due to the adjacency of the homes of plaintiffs and their neighbor to the north on respective 110' lots. But the vacancy of the subject lot and of that on the corner of Westminster Place and Overlook Road makes for at least a degree of openness and spaciousness on that side of Westminster Place, consistent with the zone plan, which would be notably diminished by the grant of the variance here sought as that would result in a row of four adjacent homes on 110' lots on that side of the street.
A planning expert for plaintiffs testified that since about half of the building lots in the neighborhood were of the smaller size the grant of a variance for the subject property would "not violate the general character of this community." However, a realtor having appraisal experience testified for the objectors from a prepared report, admitted in evidence, which concluded that "the neighborhood trend is stable and upward and tends primarily to the establishment and continuation of fine one family dwellings on large parcels of land in excess of 200 ft. width"; that recent zoning revisions confirmed that trend, and that subdivision into smaller lots "would tend to decrease rather than increase the *514 general level of desirability and value of the residential properties in the described neighborhood." But on cross-examination the witness conceded that erection of the proposed structure on the subject lot would not reduce the market value of the adjacent homes. A number of individual homeowners appeared and expressed the opinion that the grant of this variance would impair the character and residential value of the neighborhood. Some testified they had purchased their properties, or had acquired land adjoining their homes to maintain the existing character of the area, and had done so in reliance upon the existing zone scheme.
The members of the board of adjustment and the judge of the Law Division found this to be a close case, and so do we. A contrary determination by the board might well have withstood legal attack. But these observations only serve to emphasize the fact that the law reposes a large degree of discretion in a board of adjustment either to grant or deny a variance, whether one for bulk requirements because of hardship under paragraph (c) or one for relief from use restrictions based on "special reasons" under paragraph (d) of the statutory section. N.J.S.A. 40:55D-70.
In Fobe Associates v. Demarest, supra, the Supreme Court recently expressed itself anent this subject as follows:
As was stated in Mahler v. Borough of Fair Lawn, supra, 94 N.J. Super. [173] at 185-186, an Appellate Division opinion we adopted in affirming in that case (55 N.J. 1):
Our cases recognize that there is an area of special discretion reposed in the local agencies within which, in many situations, either the grant or denial of a (d) variance would be judicially sustained. The board of adjustment weighs the facts and the zoning considerations, pro and con, and will be sustained if its decision comports with the statutory criteria and is founded in adequate evidence. See Rain or Shine Box Lunch Co. v. Newark Board of Adjustment, 53 N.J. Super. 252, 259 (App. Div. 1958); Yahnel v. Board of Adjustment, Jamesburg, supra, 79 N.J. Super., at p. 519.
It is apparent that in many, if not most, cases the decision of a board of adjustment on a contested d. variance application is an amalgam of resolution of fact and exercise of discretion. It was *515 put this way in Yahnel v. Bd. of Adjust. of Jamesburg, supra, 79 N.J. Super. at 519.
* * * the statutory rationale of the function of the board of adjustment is that its determinations that there are special reasons for a grant of variance and no substantial detriment to the public good or impairment of the zone plan, etc., in such grant represent a discretionary weighing function by the board wherein the zoning benefits from the variance are balanced against the zoning harms. If on adequate proofs the board without arbitrariness concludes that the harms, if any, are not substantial, and impliedly determines that the benefits preponderate, the variance stands. [74 N.J. at 538]
The views thus expressed are as applicable to (c) variances as to the (d) variety. Moreover it is settled and sound doctrine that a court should be more circumspect in overruling a denial of a variance than a grant because more is to be feared in the way of breakdown of zoning plans from grants than denials of variances. Fobe Associates v. Demarest, supra, 74 N.J. at 535; Kohl v. Fair Lawn, 50 N.J. 268, 275 (1967); Cummins v. Leonia Bd. of Adj., 39 N.J. Super. 452, 460, 461 (App. Div.), certif. den. 21 N.J. 550 (1956).
It bears reminder that there has been no suggestion in this case that the zoning restrictions are unreasonable in their application to this neighborhood. The board therefore cannot be faulted in its concern that the zone scheme and plan not be substantially impaired by variance  a concern expressed in the statutory regulation of the powers vested in such boards in passing upon variances. N.J.S.A. 40:55D-70 (omnibus clause). In Kramer v. Sea Girt Bd. of Adj., 45 N.J. 268, 296 (1965), the court, in affirming, adopted the following language of the Superior Court, highly significant in the present context:
In these highly controversial and often times debatable zoning cases the courts must recognize that local officials "who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people are undoubtedly the best equipped to pass initially on such applications for variance." Ward v. Scott, 16 N.J. 16, 23 (1954). Therefore, the law presumes *516 that boards of adjustment and municipal governing bodies will act fairly and with proper motives and for valid reasons.
Each case of this kind stands and is to be decided on its own facts. On the present record, taken as a whole, we cannot find that the Law Division erred in sustaining the decision of the board of adjustment in this case as within its sound discretion and as not representing an arbitrary, capricious or unreasonable action. On the contrary, we find the board to have gone about its duties in this case in a most careful and conscientious manner and its conclusions in the matter to have been entirely reasonable.
Judgment affirmed; no costs.
NOTES
[1] The powers of a board of adjustment to grant a bulk variance under the cited section of the Municipal Land Use Law, L. 1975, c. 291, are substantially the same as under the previous zoning law, N.J.S.A. 40:55-39(c), and the decisions interpreting and applying the prior law remain applicable.
[2] We do not here confront considerations bearing upon the current general need to provide housing for persons of low or moderate income. See Fobe Associates v. Demarest, 74 N.J. 519, 534-537 (1977); Pascack Ass'n Ltd. v. Washington Tp., 74 N.J. 470, 480 (1977).
[3] The members of the court visited the scene for the sole purpose of better understanding the evidence of record and matters stipulated, not to expand the record. See Yahnel v. Jamesburg Bd. of Adj., 79 N.J. Super. 509, 511 (App. Div.), certif. den. 41 N.J. 116 (1963).