249 N.J. Super. 568 (1991)
592 A.2d 1236
RICHARD R. HAWRYLO AND ALEXANDRA HAWRYLO, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
BOARD OF ADJUSTMENT, HARDING TOWNSHIP, THOMAS WALKER, JR., AND ELIZABETH WALKER, HIS WIFE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1991.
Decided July 18, 1991.
*570 Before Judges DREIER, ASHBEY and LANDAU.
Edward A. Berman argued the cause for appellants (Hersh, Ramsey, Berman & Rockoff, attorneys, Edward A. Berman, of counsel, Randie S. Berman, on the brief).
Myles C. Morrison, III argued the cause for respondent Thomas and Elizabeth Walker (Dillon, Bitar & Luther, attorneys, Myles C. Morrison, of counsel, Nicholas L. Paone, on the brief).
Gary T. Hall argued the cause for respondent Harding Township Board of Adjustment (McCarter & English, attorneys, Gary T. Hall, on the brief).
The opinion of the Court was delivered by ASHBEY, J.A.D.
*571 Plaintiffs, adjacent landowners, appeal from a prerogative writs judgment upholding a Harding Township Board of Adjustment (Board) grant of an N.J.S.A. 40:55D-70c(1) variance to defendants Thomas and Elizabeth Walker.[1] The variance permitted the Walkers to rebuild the wooden part of a barn 42 feet from plaintiffs' driveway, just across the property line, where the zoning ordinance required a 100-foot distance. Following argument on plaintiffs' prerogative writs challenge, the judge ruled that the Board's decision was not arbitrary or capricious and complied with relevant law.
On appeal, plaintiffs claim that the prerogative writs judge erroneously interpreted the requirements of N.J.S.A. 40:55D-70 and erroneously permitted the Board to ignore the expert testimony of Michael F. Kauker, plaintiffs' expert planner. Plaintiffs urge that the Board's resolution did not justify the variance, and the court should have disregarded the resolution which was improperly influenced by individual board members, whose reasoning reflected an erroneous understanding of the applicable law.
The site of the proposed barn was the foundation, including basement walls, of a barn originally built in 1920, preexisting the zoning ordinance. The 1990 variance was not the first that had been granted for the rebuilding, another variance having been issued in 1965 to rebuild the barn on the old foundation.[2] The Walkers had delayed in applying for a building permit. Having received a permit in 1972; reissued in 1973, they again *572 delayed, not starting to build until 1989. A stop-work order was issued by the municipal construction official. The Walkers again applied for a variance. The zoning board held hearings, inspected the site and unanimously voted in favor.[3]
The area surrounding both plaintiffs' and defendants' lands was described as rural. The Walker property consisted of a 9.824-acre tract located in the township's R-1 Zone, in which single-family dwellings and accessory buildings are permitted on lots of at least three acres with the minimum 100-foot setback on all sides.[4] Both plaintiffs' and defendants' properties are accessed by a rural road bordered by meadow and pasture land. Between their two substantial tracts was a heavily-wooded undeveloped 3-acre tract. Plaintiffs' residence, on the "flag" portion of their flag lot, was on the other side of this vacant wooded lot, as the Board found, over 1,000 feet from the old barn foundation. The driveway to plaintiffs' house was a 50-foot-wide right-of-way, the "pole" of the flag lot, adjoining the length of the Walker property.[5] That driveway was lined on the right with what was characterized as a "hedgerow," and the owners of the land adjoining plaintiffs' driveway on the other side had no opposition to the variance.
On the Walker property there was a main house with a nearby swimming pool, a smaller residence occupied by Thomas Walker, Jr., and an old shed which was near the remains of the old barn, also close to the driveway. The shed was then being *573 used to house Walker's two horses.[6] The old barn foundation was actually 46 feet from the "pole" of plaintiff's flag lot.[7]
Walker, who had lived on the property at various times all of his life, testified that the old barn foundation, which went 10 feet into the ground on one side, and 8 feet on the other, was bottomed by concrete. In the 1940's, the foundation had been covered by a wooden floor. Ultimately, rotting floor boards made potential falls to the concrete below a risk. In the 1950's, therefore, his parents had dismantled the upper, wooden, part of the barn, preserving the foundation and basement, on which they intended to rebuild when finances permitted.
The existing structure, apparently, also included original stairs. The 1989 Walker plan was to use the existing basement for the storage of tools and farm equipment and the ground floor for Walkers' two horses, replacing Walker's stabling them in the shed. Walker testified that the existing foundation area was of sufficient depth to accommodate a full-height basement room, and, to that end, before they were prevented, the Walkers had cut a ramp into the side of the foundation, also cutting into the foundation's surrounding berm.[8]
The Walker parents had saved pre-existing horse stalls from their residence which had once been a carriage house. They proposed to place them in the reconstructed barn. Their size required building a first floor overhang of four feet, making it necessary for them to seek a variance for a set back of 42 feet, *574 rather than the 46 feet which was the distance from foundation to property line.[9]
Walker testified that $15,000 would be saved by using the existing foundation, $5,000 in excavating costs and $10,000 to build a comparable foundation elsewhere in the property. Walker said the old site was next to an existing water line which came from the pump house, apparently also near plaintiff's driveway. In addition, using the old foundation would assist him in being able to clean up around the foundation and around the shed, which he could then fix up.
Walker said that he had lived 40 years in Harding Township, and that it was common for out-buildings to be located within 100 feet of a property line, giving five examples, which he characterized as neighboring properties. Walker said he would shield plaintiffs' driveway with evergreen trees, some of which had already been planted, replacing the brambles which had been allowed to grow in order to discourage approach.
Plaintiff, Richard Hawrylo, testified that he opposed the application since it would detract from the appearance of "spaciousness" to those driving up his driveway, there already being one nonconforming structure along the way (the shed). He said the proposed building was "out of character for the area."
Plaintiff also offered the testimony of professional planner Michael Kauker, who characterized the area of construction as a "lightly wooded glade." He told the Board that there was no reason the proposed barn could not be built within a conforming location. Kauker acknowledged that the location of the barn, considering the intervening woodlands, would preclude "visual access" from plaintiffs' house. He was unfamiliar with details of surrounding properties and had never looked at the master *575 plan. In his opinion the foundation was not a unique feature of the property because it predated plaintiff's house and driveway.
Members of the Board commented extensively on the application prior to voting.[10] Chairman Weinstein said the variance granted in 1965 should be given some weight, as should the number of similarly located farm buildings on neighboring properties. The Chairman spoke of the soil disturbance caused by duplicating the foundation, negatively impacting on the environment. He noted that the proposed structure did not require a well, whereas one purpose of the zoning setback requirement was to "provide adequate room" for wells and septic tanks. He also concluded that there would be little impact on the neighborhood, and that, in accord with the master plan,
The open space would be well preserved by keeping the barn in its proposed location in favor of moving it elsewhere. The open space of the Walker lot, openness of the Walker lot could be more damaged by moving it [the foundation] than leaving it where it is.
His affirmative vote was conditioned on the applicant providing sufficient landscaping screening, "so that in a period of a few years ... this thing is screened out from the objector's right-of-way drive." He also urged that the grant be conditioned on the applicant repairing the unsightly shed. These conditions were incorporated in the resolution.
Board member McChesney referred to the flow of field and woods on the Walker property as part of the character of the area, saying that "plucking" the barn into the existing open space would be disruptive and contrary to the master plan. Board member Murray, although skeptical that the evidence supported a finding that a $15,000 expenditure was an undue hardship, voted for the variance because a barn on the proposed location would be more consistent with the master plan and the rural nature of the community. Board member Blanchard said, *576 "this type of structure is entirely consistent with the rural character of Harding Township as outlined in our Master Plan," and commented, "I do think there's a unique situation on this particular piece of property with the existing foundation and previous location of the barn, history of that is worth something. Tearing it down and just leaving it in ruins would not be visually acceptable either, would it?" Other Board members also referred to preserving the rural nature of the area.
The Board's resolution said that the presence of the foundation, a "substantial structure," in good condition, was a unique characteristic of the property. The resolution said that it would be a hardship for the Walkers not to be able to use the basement-foundation which had a value of at least $15,000, based on the cost of replacement, and not to use the existing water line. This did not count the cost of removing the existing foundation and restoring the surface.
The resolution also said that the variance would not result in substantial detriment to the public good, particularly to the objector's driveway use, which the Board found less significant than a residential use which would not be affected. It said plaintiffs' residential use was protected by distance and a lot-long hedgerow. It said that visual observation from plaintiffs' driveway was protected by an effective 67 feet of distance and proposed landscape screening. The Board found the variance to be consistent with the master plan objective of preserving the rural character of Harding Township, "since the variance will encourage and facilitate the construction of a barn to be used for the stabling of horses." The resolution further said that the variance would "also avoid environmental disruption which would result if the barn were required to be constructed elsewhere in the property, such as in the horse pasture."
It is clear from the comments and the resolution that the Board relied on what it believed to be the tenor of its 1984 master plan. That plan included a purpose to "promote ... open space ... natural resources and to prevent degradation of *577 the environment through improper use of land." One of the master plan's primary goals was the "protection of rural development pattern and density," noting that the municipality had "been cited by contemporary historians as a primary example of a preserved 18th or early 19th century country-scape...."
The master plan described the municipality as an area noted "for its historical and spatial continuity of agricultural uses, small village centers, roadways, low density residential structures, early American architectural style, open spaces and developmental scale." The master plan said that, as part of environmental planning, the Board could suggest the elimination of otherwise required facilities to promote the incorporation of open space.
One of the stated reasons in the plan for encouraging "flag lots" was to "allow development of large lots in rural areas without construction of major roadways which could result in impairment of environmental quality." The master plan's description of the R-1 zone referred to "problems pertaining to individual well water extraction" in the zone, and the lack of a plan to extend water service there.
In his oral opinion affirming the action of the Board in granting the variance, the judge stressed the current language of the statute, that subsection c(1) variances can be granted when an exceptional condition of the property causes practical difficulties. The judge pointed out that c(1) variances were no longer related entirely to undue hardship. He also observed that the "[unused] foundation, basement ... would represent a waste [as] the Board found, [rather than] being put to an appropriate use but for the setback variance." "Being located near a driveway, its use avoids ... disruption of other space on the property and the availability of an existing waterline." All these were circumstances, he concluded, which the Board could properly find to be exceptional physical features justifying the variance because "the strict application of the setback requirement *578 would result in peculiar and exceptional practical difficulties or undue hardship upon the owner."
Our scope of review is limited. The courts must affirm any municipal zoning board's decision unless it is arbitrary, unreasonable or capricious. Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). The Legislature empowered boards to make such decisions, based on the fact that local people, familiar with the community's characteristics and interest, are best equipped to assess the merits of a variance application. Ward v. Scott, 16 N.J. 16, 23, 105 A.2d 851 (1954); Charlie Brown of Chatham v. Chatham Bd. of Adj., 202 N.J. Super. 312, 321, 495 A.2d 119 (App.Div. 1985). Galdieri v. Morris Tp. Bd. of Adj., 165 N.J. Super. 505, 515, 398 A.2d 893 (App.Div. 1979). Nonetheless, the applicant bears the burden of meeting the statutory variance prerequisites. Chirichello v. Monmouth Beach Bd. of Adj., 78 N.J. 544, 559-560, 397 A.2d 646 (1979). "Even when the motivation is well-intentioned, local zoning action must comply with the statutory requirements." Hill Homeowners v. Passaic Bd. of Adj., 134 N.J. Super. 107, 109, 338 A.2d 824 (App.Div. 1975).
We begin with the statute. A local board may grant a dimensional variance on hardship grounds if:
(a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any [zoning] regulation ... would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property.

N.J.S.A. 40:55D-70c(1) (c(1) variance) (emphasis added). In the parlance long accepted, these are the "positive" criteria delineating part of what a dimensional variance applicant must satisfy.
Plaintiffs do not challenge that the Walkers had established entitlement to their variance respecting the other, "negative," criteria, that the variance could be granted "without substantial *579 detriment to the public good and ... not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70. They seek reversal principally on the ground that the defendants produced insufficient proofs on the positive criteria. Plaintiffs also argue that the Board and the court should have given no consideration to the fact that the old foundation represented the remains of a prior existing nonconforming structure. Plaintiffs urge that the remaining structure was and is nonconforming, and therefore not a "lawful structure." They contend that the Walkers established nothing more than that it would be cheaper for them to build a barn on the existing foundation rather than elsewhere on the property.
Before examining the merits of the controversy concerning whether defendants met their burden of proof, we begin by rejecting plaintiffs' argument that the Board improperly disregarded the testimony of their expert planner, who admitted not having reviewed the township master plan. A board is free to accept or to reject the opinions of a planner proffered by an applicant or objector. Allen v. Hopewell Tp. Zoning Bd., 227 N.J. Super. 574, 581, 548 A.2d 220 (App.Div.), certif. denied, 113 N.J. 655, 552 A.2d 177 (1988).
We also reject plaintiffs' urging that only a geological condition qualifies as an "exceptional situation," or that, to make a property unique, a nonconforming structure cannot justify a hardship variance. Prior to 1984, the hardship triggering the grant of a variance had to be caused by exceptional narrowness, shallowness or shape of a specific piece of property or by reason of exceptional topographic conditions or other extraordinary and exceptional situation. The Legislature broadened the criteria specifically to include "an extraordinary or exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon" (emphasis added). L. 1984, c. 20, § 12. Despite plaintiffs' contrary claim, there is nothing to indicate that the term "structure *580 lawfully existing thereon" was intended to preclude a nonconforming structure. See Cox, New Jersey Zoning and Land Use Administration, § 6-2.4 at 67 (1990). In his concurring opinion in Davis Enterprises v. Karpf, 105 N.J. 476, 493, 523 A.2d 137 (1987), Justice Stein said,
[A] lot with unusual topography may provide a basis for a variance from restrictions as to maximum height. A narrow lot may in some instances justify a sideyard variance. The existence of a nonconforming structure may justify a variance from maximum land-coverage requirements.

105 N.J. at 493, 523 A.2d 137 (emphasis added).
We also reject plaintiffs' related argument that nonconforming structures are per se "unlawful." While landowners have no right to rebuild a destroyed nonconforming structure, they do not have to pay for the removal of the nonconforming structure absent its being the equivalent of a nuisance. See generally Lacey Tp. v. Mahr, 119 N.J. Super. 135, 138, 290 A.2d 450 (App.Div. 1972), mod. on other grounds, 143 N.J. Super. 484, 363 A.2d 913 (App.Div.), certif. denied, 72 N.J. 466, 371 A.2d 70 (1976). Nonconforming structures, like nonconforming uses, are disfavored, but they may be continued. See Foster-Hyatt Group v. West Caldwell Planning Bd., 174 N.J. Super. 10, 12-13, 415 A.2d 349 (App.Div. 1980); N.J.S.A. 40:55D-68.[11]
We find particularly instructive the comments of the Supreme Court in Burbridge v. Old Mine Hill Tp., 117 N.J. 376, 568 A.2d 527 (1990). There the Court affirmed the grant of a variance to a landowner who had expanded without municipal permission his prior existing nonconforming fence, thereby enlarging his prior existing nonconforming auto-repair use. Id. at 380, 568 A.2d 527. In granting the variance, the zoning board had attached conditions directed to improving the aesthetics of the operation. Id. at 378, 568 A.2d 527. Using the *581 standards of N.J.S.A. 40:55D-70d, and noting with approval that "special reasons exist whenever a variance proposes to secure any of the statutory zoning goals," id. at 386, 568 A.2d 527, the Court referred to the existence of special reasons if "the use is `peculiarly fitted to the particular location for which the variance is sought,'" citing Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 279-80, 234 A.2d 385 (1967). Ibid. The Court further said, "[A]esthetic improvement of a nonconforming use to create better conformity with the existing use within the surrounding area would likely be a primary focus of a local zoning board in deciding whether to grant an expansion of that use." Id. at 387, 568 A.2d 527.
Plaintiffs rely on extensive case law which characterizes as insufficient grounds for a hardship variance that the owner would be required to spend money to put the structure in a conforming location. See Nash v. Morris Tp. Bd. of Adj., 96 N.J. 97, 108, 474 A.2d 241 (1984) ("financial loss alone has never been a basis for a finding of hardship under the statute"); Isko v. Livingston Tp. Planning Bd., 51 N.J. 162, 174, 238 A.2d 457 (personal hardship deriving from greater expense not a sufficient ground for granting a (c) variance); Loscalzo v. Pini, 228 N.J. Super. 291, 302, 549 A.2d 859 (App.Div. 1988), certif. denied, 118 N.J. 216, 570 A.2d 972 (1989) (hardship insufficient based on the "economic impact upon defendants if the variance is not granted.")
We acknowledge the cited cases. As the judge noted, however, a c(1) variance may be granted based on more than proof of hardship alone. Here, in addition to the applicant losing $15,000, there was the question of relocating or duplicating both a water source and the barn foundation. We are moreover persuaded, for reasons we will detail, that the references in question are taken out of context, and that rejecting financial hardship as irrelevant to support a c(1) variance grant does not square with current case law.[12]
*582 At one time, hardship was equated with confiscation. See Commons v. Westwood Zoning Board of Adjustment, 81 N.J. 597, 605, 410 A.2d 1138 (1980). Accord, Davis Enterprises v. Karpf, supra, 105 N.J. at 481, 523 A.2d 137; Trinity Baptist Church v. Louis Scott Holding Co., 219 N.J. Super. 490, 499, 530 A.2d 828 (App.Div. 1987). See also Galdieri, supra, 165 N.J. Super. at 510-511, 398 A.2d 893 (ownership of oversized lot not necessarily a hardship since property could be used as a home site).
In Davis Enterprises, supra, Justice Stein noted that a hardship "need not result in the inability to make any use of the property," saying, "[t]ypically, the contention is that the strict enforcement of the zoning ordinance, in view of that property's unique characteristics, imposes a hardship that may inhibit the extent to which the property can be used." 105 N.J. at 493, 523 A.2d 137 (emphasis in original). The Court accepted this view in Kaufmann v. Planning Bd. for Warren Tp., 110 N.J. 551, 562 n. 1, 542 A.2d 457 (1988), saying, "In other words, inutility, the confiscatory absence of any use, is not the sole predicate for a `c' variance," 110 N.J. at 562 n. 1, 542 A.2d 457. The Court further said:
The equation of subsection c "hardship" with confiscation was a legal rubric for deciding when a zoning board had to grant a `c' variance, not for cataloguing the only circumstances in which the board could grant the relief. It was meant to mark the plimsoll line of discretion, not its entire content: the point at which the measure of discretion, like a vessel reaching overload, had to tip.
*583 Kaufmann, supra, 110 N.J. at 562, 542 A.2d 457 (emphasis in original).
Most recently in North Bergen Action Group v. North Bergen Tp. Planning Bd., 122 N.J. 567, 577, 585 A.2d 939 (1991), the variance applicant contended that soil conditions unique to the property would make conformance with zoning height requirements a financial hardship, necessitating pilings, and the planning board granted the variance, finding such a hardship. Following our reversal, the Supreme Court directed a remand to determine "whether the record ... demonstrates a sufficient relationship between the [topographical condition] and the magnitude of the [dimensional] variances granted...." The Court acknowledged that the resolution referred "indirectly, to the economic impact on the project of the [ensuing] cost." Ibid. Since the relationship between the topographical condition and the variance requested was the cost of alleviating the problems caused by the topographical condition, we cannot but conclude that financial hardship, short of confiscation, is not irrelevant. We also conclude that a dimensional variance should be granted only so far as is necessary to alleviate the hardship.
In North Bergen, the Court further noted that, "the greater the disparity between the variance granted and the ordinance's restriction, the more compelling and specific the proofs must be that the grant of the variance" meets the negative criteria, although "the grant of bulk variances does not generally require the enhanced quality of proof concerning the negative criteria that is mandated for use variances...." Id. at 578, 585 A.2d 939. Thus, the quantum of proof respecting the negative criteria required appeared to vary in proportion to the extent of the variance needed.
The evidence of compliance with the negative criteria as found by the Board here was overwhelming. The Board found that restoring the barn site enhanced the goals of the master plan to keep the area's unique historic look. The Board found *584 that the old location accorded with the rights of all other neighbors except plaintiffs by maintaining the open meadow look, bordered by a hedgerow, and that the impact on the plaintiffs' property was minimal. The Board also found environmental benefits in conserving existing resources, while removing two unsightly existing structures. This finding of variance benefits to the neighborhood, in light of the master plan, arguably, would support a variance grant under subsection c(2), the so-called "flexible c" variance. See Kaufmann, supra, 110 N.J. at 563, 542 A.2d 457.
Although, obviously, a finding of negative criteria alone will not suffice under the law to support a variance grant,[13] nonetheless, one cannot read North Bergen without concluding that "balancing" is required for the reasonable exercise of zoning discretion. Similarly, we quote again from Burbridge,
The Board concluded that the aesthetic benefits gained by Paschal's relinquishment of 3,700 square feet of the nonconforming use was worth the expansion of 10,300 square feet. That is precisely the kind of balancing decision that is best left to the sound judgment of local officials.
Burbridge, supra, 117 N.J. at 391, 568 A.2d 527 (emphasis added).
We also cannot leave Burbridge without observing that one of the conditions which was attached to the Walker variance was that the old shed be restored and made aesthetic. Screening and landscaping were also required. It would be ironic if the grant of a dimensional variance to restore a prior existing nonconforming structure were improper because the "hardship" was insufficient, while the Board's reasons for granting *585 the variance closely resembled those approved for expanding a use variance in Burbridge.[14]
We conclude that, where (1) the Board's reasons concerning compliance with the negative criteria were overwhelming, (2) a lesser variance would not have obtained the relief needed by the applicant, and (3) the Board conditioned its variance grant on the applicant's aesthetic concessions, the Board's cited reasons, including reference to the applicant's financial burden, justified the variance. It is not for the courts to second guess the Board in its exercise of discretion. Plaintiff's assertion that affirmance would force future boards to grant variances in similar situations is meritless. What a board may do is far different from what it must do. Kaufmann, supra, 110 N.J. at 562, 542 A.2d 457; Davis, supra, 105 N.J. at 493, 523 A.2d 137.
Having concluded that the Board's action was supported in the record, we need not consider whether the 1965 variance is still valid. See N.J.S.A. 40:55D-70b.
Affirmed.
NOTES
[1] The record on appeal indicates that the Walker applicants were the parents of Thomas Walker, Jr., who testified. However, the son was also referred to as an applicant, and was the defendant in the prerogative writs action. He lived in one of the two residences on the property, and proposed to stable his own horses in the new barn. We collectively refer to all of these applicants as the Walkers.
[2] The first variance, which was for a structure intended to house cars, as well as horses, was granted on the ground that the barn was "a partially existing structure."
[3] Plaintiffs do not dispute that they were the only objectors.
[4] Other permitted uses were farms, boarding stables for horses on lots of 10 acres or more. Permitted accessory structures specifically included barns and farm outbuildings. Respecting residences, the ordinance said: "The lot shall be of such size and shape that its building envelope shall contain an area square in shape and at least 100 feet on each side."
[5] The record indicates separate, unrelated, litigation concerning the Walkers' right to use this right of way.
[6] There was a dispute concerning when this nonconforming shed was built. Thomas Walker said that it had been built sometime in the 1970's, but a later survey did not show the structure.
[7] Thomas Walker testified that the building inspector had measured on the 1947 survey that the barn at that time was 37 1/2 feet from the side line. The discrepancy was based upon the old barn extending beyond the foundation.
[8] Plaintiffs planner found this berm to be the only "exceptional topographic condition" of the property.
[9] The proposed overhang was urged by the objectors as an expansion of a prior-existing nonconforming structure, a position not advanced on appeal as separate grounds for reversal.
[10] We reject plaintiffs' contention that such comments revealed that Board members used inappropriate criteria and vitiated the resolution.
[11] No argument was made in this case concerning whether the prior existing nonconforming structure had been partially, rather than totally, destroyed, or whether the Walkers had an indefeasible right to rebuild. See N.J.S.A. 40:55D-68.
[12] It is beyond the scope of this opinion to examine the effect of later cases on those cited. See Davis Enterprises v. Karpf, supra, 105 N.J. at 481, 523 A.2d 137, concerning Nash v. Morris Tp. Bd. of Adj., 96 N.J. 97, 108, 474 A.2d 241 (1984), and Commercial Realty v. First Atlantic, 122 N.J. 546, 558-559, 585 A.2d 928 (1991), concerning Isko v. Livingston Tp. Planning Bd., supra, 51 N.J. at 174, 238 A.2d 457. We do note, however, that in Loscalzo v. Pini, 228 N.J. Super. 291, 302, 549 A.2d 859 (App.Div. 1988), certif. denied, 118 N.J. 216, 570 A.2d 972 (1989), we approved the exercise of municipal discretion represented by the action of the governing body in reversing the variance grant. The financial hardship in question was that the applicant was not able to expand a business, and the governing body found both aspects of the negative criteria wanting.
[13] Cf. Sica v. Board of Adjustment, 246 N.J. Super. 338, 587 A.2d 661 (App.Div. 1991) (existence of inherently beneficial use as special reason does not negate need to establish that variance conform to master plan). In Sica, the evidence that the proposed use did not conform to the zone plan included that the municipality had recently passed an ordinance specifically prohibiting the use in the zone. Id. at 346, 587 A.2d 661.
[14] See Kaufmann, supra, 110 N.J. at 561-62, 542 A.2d 457, citing 5 N. Williams, American Land Planning Law, § 138.03 (1985 Rev.), where the author commented that it might be easier to get a "special reasons" variance than a "hardship" variance. The Court rejected such confusion. Ibid. See also Burbridge, supra, 117 N.J. at 398, 568 A.2d 527, O'Hern, J., dissenting, "the standard for granting a variance to expand a nonconforming use may be seen somewhere between the traditional standards of `hardship' on the one hand and `special reasons' on the other...."